Morning, ladies and gentlemen. This is the time for argument in our re-hearing on Bank and Fields v. Woodford. I understand counsel are ready, so let me proceed. Good morning, Your Honors. David Olson appearing for the petitioner in this case, whose name is Stevie Lamar Fields. The penalty trial for Mr. Fields' life in this case consumed one hour and 43 minutes. And that includes time before the jury was brought in and during the recess. During the penalty phase, Petitioner's Trial Counsel, who was engaged in his first capital trial and had been appointed less than three months prior to the trial, waived the opening statement. He did not cross-examine the sole witness that the prosecution called. He did not introduce any evidence, and he did not call any witnesses. He did make a closing argument, and that takes up ten pages of the reporter's transcript. So at 2 o'clock on that day, the jury retired to deliberate the fate of the defendant. And I call him the defendant because that's about what this jury knew of Mr. Fields. They knew he was a young, 23-year-old man. They knew he had committed some heinous crimes. But they did not have any evidence that humanized Mr. Fields or that explained how he got to where he was. Now, with standing that, we know that on this jury, there was a real fight in those deliberations as to whether the sentence would be life or death, including on that first day of the deliberations. And that's what prompted the foreman in this case, Juror White, who was advocating the death sentence, to go home that evening, take out his Bible, select passages that he felt supported his position in this case, and dictionary definitions as well, for example, of the term extenuating. Suppose he, instead of consulting the Bible, he went home, making notes on the Bible. He read the Constitution and made notes and brought those notes into the jury room the next day. Would that make a difference? It's jury misconduct. I'm sorry? Your Honor, it's jury misconduct. It might make a difference, obviously, on a prejudice analysis, but the Supreme Court precedent for years has been clear. The jurors are supposed to deliberate the evidence that came in off of the witness stand. Well, I'm trying to pinpoint what your argument is. Are you saying it was the bringing in of home-prepared notes as such, or is it because the notes included some Bible passages, among other things? Or what? I'm not quite sure what your argument is. Sure, Your Honor. Well, let me try to clarify it, then. First of all, any criminal trial is supposed to be decided on the evidence. And what the district court found, what Mr. White did is, he went home, and he did this because, notwithstanding this lack of a penalty phase, there was a dispute on the jury as to what sentence would be imposed. And he consults with these biblical passages that he writes down verbatim and he brings them in. So our claim, Your Honor, is that if there was a criminal trial, this would be wrong. Second of all, in a capital case ---- What is this? I think that's the problem we're having. If he had known, if he were a biblical scholar and had recited biblical passages during the deliberations, I take it that would not be a ---- there would be no problem. No, I think that would be, again, Your Honor, I think that would be a misconduct. The jury is supposed to be discussing the evidence and the instruction, especially in a capital case which requires State proceedings that carefully focus the jury's discretion to weed out the worst of the worst. And just to be clear, though, is the primary difficulty that you're pinpointing is that he consulted an external source rather than that he just simply wrote it down. Is that correct? I think that ---- I certainly think that's a factor that equates into this. But had Mr. White ---- and the fact that he couldn't, I think, is telling as well. Had he stood up in the jury room and started pontificating about these biblical verses and what he understood extenuating circumstances were, Your Honor, I think that's misconduct. I think it's worse. I want to separate out the writing the down versus the consulting. If he simply got home and started thinking, this is for and this is against the death penalty, .123, leaving out the Bible, and then he brought those notes in, would that be juror misconduct? Your Honor, in my view, especially in a capital case, if the jury starts to go beyond the evidence that was admitted at trial, which is what back in 1880 ---- This is only coming from out of his head. He's saying pro is, you know, deterrence and punishment, anti, background, da, da, da. He just makes a pro and con list. Would that be jury misconduct? He writes it down, comes in, and then talks to the jury. It wouldn't be as egregious as what he did here, but it is misconduct unless ---- Well, what is the misconduct? I mean, if he ---- first of all, this is not a fact. Is that right? It's not extrinsic. It's not an extrinsic fact. It's an extrinsic aid to deliberation or perhaps alternative directives, which he shouldn't be talking about. It's not a fact. Well, it's not a fact. I agree with you. However, the cases, going back to Maddox, Turner, don't have this distinction of a fact. As the dissent in Polk points out, you can't find that anywhere in these cases. The constitutional ---- See, this is Judge Boardlaw. Isn't it the case, though, to some people that what is written in the Bible is considered fact? Well, that's a good point, too, Your Honor, but my point is it doesn't matter if it's a fact. And I'll give you an example. Polk goes through all these cases, and in a lot of these cases, they weren't facts. In Remmer, the juror is told if you find the defendant guilty, you can make money. That has nothing to do with the case. It's an alternative. If there's something wrong with it, it's because the ---- they've been given a set of directions to consider the facts under a certain set of criteria, and this is essentially different criteria, criteria that says that the death penalty is right in every circumstance or in circumstances other than what they've been told to do, and an appeal to Ohio law. But it's just as clarifying to me, because your briefs were not clear, that this is not a fact. What's wrong with it is something else, not that you're bringing in an extrinsic fact. And it matters when you start drawing lines, because on the questions we were asking you, it can't be right that if somebody goes in their mind to set up a set of criteria and says this is the logic against which I'm going to evaluate something, that can't be misconduct. I agree with you, and I'll tell you why. That is where the Supreme Court, since Maddox, Maddox has an excellent discussion about this. The power of private thought cannot be admitted. They don't want your ---- and, you know, Rule 606 now reflects this. That's the difference here. So part of what's wrong with this is that it's on a piece of paper, and it has a definiteness and a different mode of communication to other people. It's not because he's going to treat it differently. It's because he can now go around handing it out. That's a huge problem, Your Honor. Had Mr. White come to his decision in this case to vote for death based on his religious views of the matter, that would not be misconduct, I agree with you. That's the power of private thought. That's different under Maddox than something that is, as Maddox talks about. How do jurists come to a conclusion without sharing their different views as to morality, as to justice, and the like? You know, what do you say? You know, I have my view, I think the guy should die, but I'm not going to tell you why I think that. I mean, we're not expecting him to be insular. We're not expecting him to sort of simply state conclusions. We expect them to share common experiences, to compare moral judgments, and to sort of test them against each other. Well, Judge Kizinski, I totally agree with that. They're supposed to be in there deliberating. The question is, what are they deliberating on? A juror who decides to go home and pick out a code that he... Look, I am, let's say in this case, a Christian. I gather he's a Christian. Anyway, a juror Christian. I guess he was one of those two. And he says, you know, I know the Bible. The Bible talks about people, an eye for an eye, and talks about people who commit... And this is where I get my beliefs. The reason I think that we ought to vote for death comes from my religious upbringing. There can't be anything wrong with that, is there? I think there is, Your Honor. Sandoval talks about the problems here. But by going to, especially, Your Honor, these particular... What if the guy says, you know, I am a philosophy professor, and I've read Kant? Have you read Kant on the death penalty? Have I, Your Honor? No. Kant thinks it's immoral not to execute somebody who commits murder. So he comes in and says, you know, I read Kant. And Kant takes the view that a society that allows a murderer to live is itself immoral. Is that wrong? I mean, for the juror to explain, this is what this great thinker in history, that he studies and he teaches? I think it's wrong, Your Honor. Because if he brought every juror a copy of a book by Kant and distributed it to the jury in the jury room, would that be all right? You know, the line is drawn. The Supreme Court has... Why don't you answer my question? I thought I did, Your Honor. It would be wrong for him to say Kant. Yes. It would be wrong. Whereas it would be okay for him to say, I think it's immoral for society to allow somebody to live even though they committed murder. Your Honor, that all should have come out during the vor dire. I mean, he's overriding views on whether the death penalty is something he could impose as a juror, something they're going to delve into at vor dire, which is another problem here. Suppose that the juror said during deliberations, I think it's immoral based on my religious upbringing and training to execute this person, based on the evidence that I've heard during the trial. Would that be okay? Well, if he says, based on the evidence I heard at the trial, it would be okay. My religious upbringing and training and, you know, my reading of the Bible, my understanding of whatever philosopher he would cite to oppose the imposition of the death penalty would not be all right. I think it's misconduct, Your Honor. Can this standard be... I think the jurors are supposed to be debating the evidence and the instructions. How do we square your position with the concept that jurors do not check their life experiences at the door when they go into the jury room and that there is an inherent component in the law of punishment, which essentially is based upon the Judeo-Christian ethic of an eye for an eye? Are you saying that that is an impermissible consideration when it is the jury, is the conscience of the community that is deciding whether or not the death penalty is appropriate to be imposed in this case? Your Honor, here's what I'm saying is, and here's how you square it. That jury can talk about all their personal experiences, all their views, as long as it's in the context of a debate pertaining to the evidence, not the Bible and what the by – and certainly selected passages by a juror who's hijacking this proceeding. And we're substituting... I'm not asking the jury to do the impossible. What you're essentially asking the jurors to do is to do nothing but talk about the evidence without any regard to any experience that they bring in life to their role in the jury room as jurors. Your Honor... It's a human impossibility. Yeah, but that's not our position. If a witness testifies and he's shaking and twitching and doing it, and a juror says, in my experience, somebody who acts like that is lying, that's perfectly appropriate. If he has X-ray experience and an X-ray comes into evidence, and he says, you know what, let me help you all with this because I'm a doctor, that's fine. The problem here... That's okay. Of course that's okay. So that's based on experience that he learned outside the jury room that he's now bringing in to aid the jury in its deliberation. Yes. He's taking... I don't understand your position at all. The difference is this. A juror, of course, of course has to bring their life experiences, their knowledge to the evidence. If the Bible passages in the jury room in Fields' life penalty trial came in through the witness stamp, then there's not a problem in this case. But when a juror on his own goes home and digs this out and makes selective choices that have a lot of other problems that Sandoval talks about in the district court, that's beyond what... You can't do research. Okay. I don't want to rush things, but you do have another – there is another issue in the case, and your time is almost half gone. Okay. Your Honor, you want to hear about – well, I started with the ineffective assistance, and let me finish on that. I'll reserve a couple minutes to talk about the... Why don't we get to the juror bias issue? You want to hear about the juror bias? That might be a good idea from your standpoint. Okay. Okay. We – on the juror bias claim, this juror was – his wife, about two-and-a-half years before the trial, was the victim of crimes, as Judge Reimer noted, that were, in her opinion, quite similar to what was happening here at the trial. And, unfortunately, the rape and kidnap crime was not disclosed during Vore Dyer, although Jury Hilliard was questioned, nor did he tell anybody at the trial what he told me years later, which is, I didn't want to be on this jury, I had misgivings about serving on this jury, but nothing came out. Now... He wasn't asked. Isn't that the problem? He testified, Your Honor, and he understood, like the jurors who were at Vore Dyer prior to him, that the court's questions called for disclosure about crimes against family members. He didn't volunteer this. He... Well, he did. He did say that there had been a crime, didn't he? He wasn't asked about the details. Isn't that the problem? Well, he said she had been beaten, assaulted, and robbed, which prompted the trial judge to ask him, well, there's robberies in this case. The trial judge didn't know this woman had been raped, pistol-whipped, the extent of it, that the assailant was a young, black male, white... Was this Vore Dyer conducted by the judge, or were the lawyers allowed to ask questions too? Well, as you know, Your Honor, I mean, Petitioner's counsel didn't even question this guy. He didn't question six of the judges. I asked you a question. Did you hear the question? It was the judge. And the lawyers were not allowed to ask questions? They were, Your Honor. But this is... They were allowed. They were allowed, Your Honor. Yes. So when the jurist said what he said, counsel could have followed up with a question and said, tell us more about what happened and what the assault consisted of. He said beaten and assaulted. Was there something more to it than the beating? Could counsel have done that? Yes. Counsel could have done that. Sure. Oh, absolutely. And we have an ineffective assistance claim because he didn't do that. Let me skip ahead on this claim. Mr. Hilliard, at his deposition, I ask him, you're sitting on this jury. Doesn't this evidence remind you of what happened to your wife? Yes. He says this evidence is triggering memories while it's coming in of what happened to his wife. But he testifies. I try to be as fair as possible. Now, Mr. Hilliard, during the course of this trial, talks about the case with his wife. Remember, her assailant has never been apprehended. Her assailant threatened to return to the house and kill her, and he had her driver's license that he had robbed with the purse. He looks like he has the same general description as Fields, and he's on the streets. Based on these conversations, and this was one of the reasons for the initial remand by the panel. Well, isn't that really the heart of the difficulty from your point of view at this point, because the district court found that Hilliard was not partial, but he was impartial. So. May I speak to that, Your Honor? Well, that's why I asked. What the district court found was that they did have these conversations that you and I had a couple years ago. We talked about whether the declaration will. They have these conversations. Every night, she believed, the wife believed, based on what the juror was telling her, that there was a reason or a good possibility that Fields was the person who attacked her, and she tells him this every night, and she wants to go to the trial to see if Fields is the guy. The problem at this point is that Hilliard said, oh, that was just, she's just being  Well, that's not what he did. He said that she's being paranoid, and I paid no heed to it. And the district judge found that was the case. So at this point, there's climate. Your Honor, Mr. And I'll get to that right away. Mr. Hilliard also said over and over the reason he didn't let his wife come to that trial was because he didn't believe that she positively identified Fields as the guy. That would disqualify me as a juror and judge to present. It is, Your Honor. It's not. Well, come on. It's your spin on what he said. That's not what he said. Your Honor. I understand that's your spin. Your Honor, I Are you arguing actual bias or implied bias or both? Your Honor, we have implied bias. We have.      It's just not. Okay. Remormatic. Does it matter what the judge found that he's objectionable or not? I'm going to tell you, it matters on this claim because this prong of the claim arises under Remormatics. There should have been a presumption of prejudice applied to these conversations. Let me ask you something. I'm concerned about where you're taking us in a couple of ways. Now, my understanding is that this particular juror, I guess we're calling him by name at this point, but was African-American and the defendants African-American. Is that correct? That is correct. What's in the record about how many African-Americans were on the jury? There were three, Your Honor. All right. And so my concern is that obviously to some extent that defense counsel wanted him on because he was African-American and similar, but then also the presumption that you want us to accept, I'm concerned about where that will take us in the sense that people that grow up in crime, high crime rate areas, if there's a presumption because someone that you know has been a victim of a crime, that that is an implied bias, people are not going to be able to get the juries that they want to get or that they're entitled to under the law. I mean, the statistics show, for example, that I think, you know, that blacks are more than twice as likely to be victimized than whites, Hispanics more than whites as well, and that in terms of with respect to homicide, Hispanics are more than three times likely as whites to be victims, with blacks more than ten times likely. If you say that because someone in their family, you know, they've grown up in say perhaps a high crime rate area has been a victim of a crime and that presumptively there's implied bias, it's just going to knock all sorts of people off and actually defendants aren't going to be able to have the type of jurors that they want. But we're not saying that, Your Honor, and on this aspect of the claim, under Remer Maddox, any private communication or tampering with the juror, and it's a low threshold, triggers a heavy burden on the State to disprove prejudice. I don't believe in every trial there's a juror who's gone through what Mr. Hilliard went through with his wife, who's told by his wife, the defendant you're supposed to be impartial and indifferently judging, I think, raped me and beat me and is the one that threatened to kill me. That triggers a presumption. So your implicit bias argument, as I understand it, is in a way another version of an extrinsic evidence problem or an extrinsic influence problem. This portion arises under Remer Maddox. And if you read Caliendo, which is another case that applied Remer Maddox out of the Ninth Circuit a couple years back, it says, and here's to go back and answer Judge Callahan, if the juror says, I wasn't impacted. Saying that without these conversations and the wife's requests and his reaction to the wife's requests and so on, I assume your argument would be extraordinarily weaker. In other words, if you were just talking, and for reasons such as the ones Judge Callahan was mentioning and others, if you were just talking about the similarity of the crime and accepting the finding that he wasn't hiding anything on purpose, it seems to me that it would be a very problematical proposition. I think it's a very strong implied bias claim, even without the conversations. You know, the incredible similarities in the crimes. They happened ten minutes away. Did the fields look like the guy who attacked the wife? He was still on the loose. And, you know, the jurors testify, and this is triggering memories of what happened to my wife, and he won't let her go into the courtroom. Kagan. You've had a complete fraud, dear. If somebody said, have you been a victim, have one of your relatives been a victim of a crime, and somebody said, yes, my brother was murdered, and the lawyer decided, well, that's fine. He just has to have that person in the jury. Are we then going to say there's implicit bias and that person can't sit in the jury? No, Your Honor. But that's the problem with the – and that's why we also have a McDonough-style claim here, because Juror Hilliard didn't tell anybody that his wife had been raped, that he had misgivings. Supposedly, what he told me years later, he didn't want to serve on this jury. He fooled the judge, who focused on Robbins. But we have a finding on that, and that's very difficult. We have a judicial finding that that was not intentional and that he didn't mean to mislead anybody. Your Honor, we don't need intentional for the implied bias. My point is, as Judge Reimer wrote, this juror was not completely forthcoming. That's why the lawyer didn't have an opportunity, assuming he would have done what he should have done, and that's why, more importantly, Judge Martin didn't highlight for Juror Hilliard the sexual and rape crimes that were involved. I have about four and a half minutes. Aren't you arguing for an irrebuttable presumption, Mr. Olson? No. No, not at all, Your Honor. I'll tell you how the presumption could have been rebutted in this case. I think you're paranoid. Come to court tomorrow. You look at Fields. You tell me if he's the guy who did it or not. There was an excess of zeal by Mr. Hilliard to stay on this jury. He was not going to jeopardize his seat on this jury, even if it meant not knowing if this guy was, in fact, as his wife was telling him. That's contrary to what you say he told you. I'm sorry? You told us that he told you he didn't want to be in this jury. He told me that. Isn't that a disconnect? It is. Absolutely. I don't find him credible. He told me years later he didn't want to be on the jury. The district judge found him credible. Isn't that the problem? I'm sorry, Your Honor? The district judge found him credible. The district judge found that he didn't knowingly lie during Vore Dyer. That's what he found. He didn't, on the grammar mattocks, he certainly didn't apply the presumption that that needs to be applied in this case. You said that the presumption is not irrebuttable. The presumption of prejudice, implied bias, is not irrebuttable. I agree with that, Your Honor. Now, what kind of evidence would you admit or agree would rebut the presumption of implied bias? In this case, he should have let his wife go to the trial. He's listening to her, Your Honor. Every single night she's telling him, I think this is the guy. Rather than demonstrating this zeal to protect his seat on the jury, if he truly didn't believe her, he should have let her come into the courtroom. Well, we'd have a whole other case if that had happened. And, Your Honor, and I would like to reserve on doubt to about 250, but Caliendo has a list of factors that should be analyzed in determining whether the State has met its heavy burden of rebutting the presumption. Thank you, Your Honor. Good morning, Your Honor, and may it please the Court. Floyd Hilliard did not lie. He did not conceal material facts, and he did not intend to mislead the Court or counsel or even his fellow panel members when he testified on Vardyar. On the contrary, Floyd Hilliard was forthcoming. This was an extraordinarily candid juror who understood without being asked, without being prompted. Extraordinarily candid may be a little excessive. Even the judge didn't understand that his wife had been raped. No, the judge certainly did not understand that. He thought that it was just a robbery of the wife. If he'd been extraordinarily candid, he might have told the judge what was important, that his wife had been raped. I'll settle for candid, Your Honor, and I have a specific reaction of an evidentiary kind to your allusion to the judge's belief, which is that there was a forced videotaped deposition in this proceeding which bears very heavily on the question of Mr. Hilliard's credibility and candor, and that is the deposition of Juror John Warner. Mr. Warner testified that Hilliard had said on Vardyar that his wife had been raped. When confronted with the reporter's transcript, which showed that no such question had been asked and that Hilliard had said, instead, my wife was assaulted, beaten and robbed two years ago at Christmas, Mr. Warner explained on videotape and it's a compelling piece of evidence, that he assumed that that meant that the assault was a sexual assault. That is, that by Mr. Hilliard revealing in 1979 that his wife had been assaulted and beaten, he meant to bring to the Court's attention that it was a very serious attack. And there is no indication, Your Honor, I urge you to spend the time to look at these portions of the videotape of Mr. Hilliard. It is an extremely compelling piece of evidence. It will revive your faith and belief in the jury system. Well, let me just tell you what bothers me about the case. It's not that he was trying to be gentle in his description. Yes. Or that he was candid, because I take all that as a given. Yes. It's not an actual bias case. It's an implied bias case. What bothers me is that he goes home, and as I understand the testimony, every night during the trial, he talks about this defendant with his wife who, whether it's crazy or not, believes that this defendant was the one who attacked her. So that, to me, is the difficulty that you have to get over on this implied bias, because he may have testified as he did, but I don't think he's the standard. It's supposed to be an objective standard, not Mr. Hilliard's subjective standard. So it would help me if you would address that specific point. Yes. I can begin by addressing by saying that the rendition of the conversations that you've heard this morning and which is reflected in the question you put to me is grossly inaccurate. There is no record evidence whatsoever that these conversations took place nightly. Well, yes, there is. I mean, and you said before that something else wasn't so, which is so. She said exactly that. She said every night. That's what she said. But Mr. Hilliard disputed that, and the district court found that there, specifically, the district court's finding was that there were no conversations about the substance of the trial which affected his ability to be fair and impartial. No, but that's not the point. I take that. The point is that they're talking about this every night, and this is the fact that the person sitting over there as a defendant is somebody that she believes is her attacker. I believe that. And that's what they're talking about. So that's the every-night testimony. The every-night testimony that you're alluding to, Your Honor, came in the declaration. No, I meant there was no written deposition. You agreed that that was what happened. Specifically. I mean, you may as well be able to question the record. Let's just start with the testimony. Do you – is it your position that there is not testimony in the record that this defendant was talking with his wife every night, not about something that, in his view, would affect the substance, but about who this defendant was and who he might be vis-a-vis the wife? I believe that Mr. Hilliard disavowed the suggestion that the conversations were constant. And I believe that it enclosed it. Isn't that what the trend – isn't that in the record? Mrs. Hilliard might have said that, but it's important, Your Honor, in reviewing this, to consider the entire context of the – of the deposition. So she might have said that, but we just throw that out because she just happens to be the person who was one half of the conversation? No. We don't throw it out. But we remember that she is not the juror. We remember that what is in her mind and what is in her fear system, what is in her anxieties, are not Mr. Hilliard's. No, but for example, let's say it happened just once, and the – and Mr. – the juror went to the judge and said, my wife thinks that this is the person who raped her years ago. I don't think so. During the middle of the trial, do you have any doubt that that juror would have been excused? I don't think there would have been further inquiry. I certainly do, Your Honor. And – and – and in fact, there should have been further inquiry had that happened. Had he been extraordinarily candid and gone to the judge at that point, certainly something would have happened in the trial. It would have come to a halt at least until that issue was resolved, and he probably – you'd have to concede – would have been excused. That's the virtue, Your Honor, of having this 28-year-long odyssey of appeal, because we have the advantage of having conducted exactly such a hearing. We know what would have happened. We don't have to speculate what would have happened if the trial – if Mr. Hilliard had stepped forward and said, my wife thinks that this might be the man. She never said, that's the guy. She never said that. She expressed her anxiety. Would it matter whether she thought – I mean, obviously, it would be stronger if she said, that is the guy. Yes. But the fact that she says, that might be the guy, doesn't that really put us in the same position in terms of evaluating? No, Your Honor. It is not nearly as strong. It's the expression of, as Hilliard himself put it, as Hilliard himself put it, an understandable aftermath of her extraordinary experience. But, Mr. Hilliard, the important thing to bear upon in analyzing this question is to concentrate on the evidence of what was in Hilliard's mind.  Kennedy, is it really what's in his mind, or isn't the test what the average person in that position would have felt? That's the implied bias test, Your Honor. That's correct. However, however, the implied – the implied bias test is unavailable for application in this case because it is Teague-barred. We know that it is Teague-barred because in Dyer itself, the leading en banc expression of this Court's understanding of implied bias, the Court expressly says, we need not resolve the question of whether dishonesty is required for implied bias. What that means, what it can only mean, is that at the time the California Supreme Court acted on this, it was not compelled by precedent to grant the relief under implied bias that is being sought. I thought Dyer said that implied bias was the oldest test that there was, that had been here since 1611 or something. Exactly, Your Honor, but that brings me to the essential point, which is that Dyer and every other implied bias case in this circuit, except for one, involves gross dishonesty. The very point of Dyer was that jury freedom. The dishonesty, if a juror is in a position, due to his experience, that the average person would not be unbiased, that's implied bias. And it doesn't matter what the juror feels. A test is would the average person whose wife has been raped under these circumstances shortly before by a similar-looking person in the same area whose wife is distraught about it, who stood guard at a door with a gun in his hand for weeks, would the average person who had gone through that experience be subject to implied bias? If you apply the implied bias test, what you've said is quite true. You've simply omitted the heart of my point at the moment, which is that under McDonough, dishonesty is required. The panel in this case itself said that it implied, all but held, that this was teed barf. Because the whole point of implied bias is that the average person who's gone through this experience would not be capable of being an unbiased juror. And, in fact, I think Dyer says it doesn't matter whether he says honestly or not, or whether he believes that he could be biased. No. No, Your Honor. Dyer – the linchpin of the Dyer decision, the linchpin of the Dyer decision is that Juror Freeland lied spectacularly, often, materialized. She said that her – there were no victims of crime in her family. She was asked directly and pointedly. And she lied. Her husband was in jail at the time she was denying this. Her brother had been shot to death. This is a juror who, in Judge Kaczynski's terms, lied her way into the jury room. That did not happen here. And dishonesty is important, especially in a case like this, because – because it is the dishonesty – it's the dishonesty which confirms the bias. The very notion of bias in the jury room suggests an inclination. But doesn't that put you back into actual bias as opposed to implied? And there's got to be some distinction between actual bias. You're saying, well, the dishonesty confirms that he was biased, so now that's actual bias. So that, under your formulation, I'm having trouble understanding the difference between actual and implied bias. How will you ever – you're saying you can't have implied bias without dishonesty, but if you're dishonest, that shows actual bias. Well, I think – So there's no difference. No, no. I'm not saying there's no difference. I'm saying that actual bias, what's usually called bias in fact, is typically revealed on voir dire when there are honest responses to questions of material fact that expose some recognized bias that justifies either a challenge for cause or a peremptory challenge. Implied bias is bias by action of law. It's observed as justice – You're not saying there is no bias, are you? No, Your Honor, I'm not. I'm saying that Madonna requires dishonesty. I'm simply saying that. I'm suggesting – and this is really the heart of my argument. What is the connection, then, if you are saying if somebody was the brother of the prosecutor and for some reason wasn't asked that question, so he wasn't dishonest, would he or wouldn't he stay on the jury? Would there be a problem afterwards? Yes, there would be, Your Honor. And there are cases, in fact, which discuss just that, not from the circuit, but in fact – So there doesn't have to be dishonesty. That is a good example. He doesn't ask the question. He doesn't lie. So he isn't dishonest, but he's the brother of the jury – of the prosecutor and it doesn't come out until after the trial. The concurrences in Madonna and Justice O'Connor in the Phillips case suggest that there is an extraordinarily small number of cases of concurrence. So dishonesty is not essential. It's the bottom line. Well, no. The bottom line is that at the time the California Supreme Court acted – that's the bottom line. I'm sorry? The bottom line is that at the time the Supreme Court denied – of California denied relief, there was no settled law which compelled it to grant that relief. That's what Teague says. Well, so you disagree with me on your Teague analysis. Where does that leave you, hypothetically? Hypothetically, I think that the findings of the district court are very important in analyzing whether there was, in fact, implied bias. But if it's implied bias, then it's hard. I mean, we're talking about the – leaving aside Teague. An objective test and not a subjective test. That's the difference between actual and implied. In the case of Teague, there was no actual bias, but in the case of Teague, there  And if there was an actual bias, we can accept the district court's finding. Looked at the jury, looked at the state, and said he was not actually biased. But implied bias, I think, entails more of an objective test. Yes, it does. Would you agree? Yes, it does. And how do you square the two? To answer very directly, where does rejection of the Teague test leave us? Hypothetically. Yes. It leaves us with the assertion that there are no cases, there are no cases, which hold that a prospective juror who is related to the victim of a particular crime cannot, as a matter of law, serve on a jury where there is a similar charge. In fact, in fact, and I think that this is the most direct response to your question, Your Honor, there are two Tenth Circuit cases which very strongly imply that that rule of law is unsustainable and is, in the words of the Tenth Circuit, an insult to prospective jurors and to our jury system. And the two cases involve, in my view, instances of considerably more potential problems, because the two cases involve child molestation, where the prospective juror had been a victim. The juror, now, not his wife or his brother, the juror had been molested. And another case in which the charge was rape, and the prospective juror had herself been raped, not her sister. So our answer is that implied bias ought to be reserved for the most narrow terms. And, in fact, I'll say to you, Your Honor, what if the juror is a sister of the prosecutor and just nobody asks the question, the judge doesn't ask the question, and that would be the reason the lawyers don't ask the question. So she doesn't lie. Kennedy, in the case of the Alsopp case, the jurors don't ask the question.  The question is, what if the juror is a sister of the prosecutor, or the wife of the prosecutor? Those relationships are the sort of relationships which this Court alluded to and applied in the Alsopp case. That is, where the individual juror, him or herself, has the direct relationship. And those are typically, as Judge Silverman put it in his dissent and concurrence in the first Fields case, those are typically the cases where traditionally there is found a bias. And I suppose that that would be the case. Kennedy, that's implied bias. That's regardless of whether or not it could be the strange sister. The question is, what if the juror is a sister of the prosecutor, or the wife of the   The question is, what if the juror is a sister of the prosecutor, or the wife of the  That's regardless of whether or not it could be the strange sister. You know, they might not have talked in years because they don't get along, or because they don't get along. Do you really want to concede that? I mean, it seems to me at some point the defense counsel has some role in asking some questions. Yes, of course he does, Your Honor. And in this case, as was pointed out earlier, he had that opportunity. But in this case, the problem is that a lot of what the problem is didn't exist at the time. The problem being these conversations and whatever emotional involvement was going on during the trial with his wife. That's right. And the fact that he does, in fact, say that he didn't allow her to come in because what if she, in fact, ID'd him, suggesting quite plainly that he thought there was some possibility that she would. He didn't think it was beyond the realm of possibility that that would happen. So that set of things didn't exist and couldn't have been voir dired. That's exactly right, Your Honor. And I think that's a good point, Your Honor, on the other hand, that points out how extraordinarily important it is that we've had the opportunity to have the extensive litigation post-trial. Those exact issues and problems and suggestions of error have been explored in great detail by the district court judge and by the panel. All those questions have been very thoroughly and adequately reviewed. Are you as happy with the district judge's findings on the other issue? Well, the district judge's findings on the other issue, Your Honor, did not involve the same sort of findings. I thought so, didn't I, because we had all that exploration and all those years of inquiry and district judge's careful findings. We ought to be just as influenced on the biblical quotation. Judge DeFriesian made an error of law. There is no dispute. There is no dispute. In fact, I can answer the question yes, because there is no dispute about this piece of paper with the biblical quotations. Judge DeFriesian found, and no one has challenged the fact, yes, in the crabbed handwriting of this rather self-important foreman, there they are. But there are a list of pros and cons. The point I'd like to really stress about the biblical quotations and what distinguishes this case from every other one is that there are pros and cons. I beg your pardon? I don't remember what the cons were. The cons were? There were no biblical cons that were directive and in some sense contrary to the instructions that were being given as to what balancing was supposed to be going on under California law. No, there were no specific biblical citations. That's correct. And no references? Nothing about neither specific nor unspecific. That's correct, Your Honor. There were none. There were, however, references to the possibility of rehabilitation, the risk of executing the wrong man, the problem of discrimination. Yes. These are the cons. How many? I'll read them. I was paraphrasing. Read me the biblical ones. All right. There were no biblical cons. No, there are no biblical cons. I'm sorry. I was answering that question. No, you're answering my question. I beg your pardon, Your Honor. No. What you said is there were, in other words, a list of biblical quotations that were pros and cons. And I don't remember any biblical cons. I was trying to read them. No, Your Honor. I Then you said no specific ones. And now there are none at all. I apologize for misleading the Court. The biblical quotations were all of the pro kind. But that leads me to make what I think is a critical point. The first statement is that the list of biblical quotations all cut one way. Yes. There are probably things in the, if you take the Old Testament and the New Testament together, there are probably things that could have been found in there cutting the other way.  Which, of course, suggests the possibility that in a jury room with 12 average jurors, it is overwhelmingly likely that this list would have prompted for the attitudes or love thy brother as thyself or turn the other cheek or forgive 70 times 7. The multitude of things. The point about That was not what was on the list that was brought into the jury room. None of those. If you look at the record, I think it's 86 to 89, all of the biblical quotations are in favor of the death penalty. That's correct, Your Honor. But they are in favor in an abstract way. But this is my concern. They're not it's not so much that they're in favor of, but they are absolutist. In other words, the directives that are being given by the instructions under California law are weighing and considering mitigation. And these are absolutes. They seem to say, don't do that. Alluding back to a question that you asked of opposing counsel, Your Honor, and trying to distill a rule from the many cases that have been that have analyzed the importation of biblical quotations. It seems to me that it's fair to say that the vice, the vice that the courts attempt to address is the risk that those biblical commands will supplant the trial court's instruction. We have objective proof in this case that that was not the intention and that, in fact, that did not happen. And the objectives. You know it's not the intention, but how do you know it didn't happen given the rather, I think, far from coincidental timing of where the jury was and where they were after the list came into the jury room and there was such a short deliberation for a death penalty? Those facts that you just mentioned are absolutely inadmissible and excludable under 606B and are very much at the heart of Judge Terezian's error. And the reason we have a rule like 606B. What is his legal error? You started there, but I don't think we got to hear it. So what specifically would you target as his legal error? His legal error is that White's importing of this piece of paper into the jury room overcame the section 190.3, aggravating and mitigating factors that the trial court had instructed the jury to use in considering the penalty. You know, that's not an error. An error is something a judge does, okay? So what is it that Judge Terezian did that was erroneous? What happened in the jury room is not an error. He granted the writ, Your Honor. That was erroneous. There was no constitutional error in this case. He found a constitutional error. He considered he first said he wasn't going to, but to some degree did consider testimony about what the jury's vote was at various times. Yes, Your Honor. He expressly referred to it. And that's the thing. He wasn't going to. That was sort of his trick. He granted the warden's motion to exclude large volume of evidence under 606B and then turned right around and used it. But your position, as I understand it, is that you do have to prove prejudice. So how do you prove prejudice? I mean, doesn't that lead to a structural error sort of approach to this sort of thing? No, Your Honor. Since you can't and we don't want you to go into the jury deliberations, and that's an independent bad in itself, then how do you – that if you start dragging prejudice in, you're – it becomes an impossibility. I see your point. And I think the answer is that the objective test allows prejudice to be seen. And that's back to my point that as far as my research discloses, unanimously, unanimously, every case which is found even during misconduct and non-punishable during misconduct has involved those instances where a juror brings into the court, into the deliberation process, only the eye for the eye stuff, not the balance. Well, if he brought in a Bible, instead of going home, he – like a lot of jurors you see in the jury room, they have Bibles and they – during their breaks, they're reading a Bible. That's right. So instead, he brings it in and then he opens it up and he reads just these selected passages to the jury. Would that be okay? Your Honor, I think that the bringing the Bible in is – is questionable. It would be – Okay. So your answer is that that would not be okay? No. My answer is that it would violate the instruction of the trial court. The trial court told the jurors not to consult outside sources. Okay. So he violated the – I think that the difference is that in either case, is there a violation of the United States Constitution so that there is no difference in that respect? Ms. Payne. Let me just go back. So you don't think that there is any problem with bringing a Bible into the jury room in any case and selectively picking out things that you think support your point of view and presenting those to your fellow members of the jury? We are not asking the court to condone what Mr. Hilliard did. No. Then answer my question. I don't care whether we condone or bless it, but the question is, would it be permissible to do that? To bring a Bible in? To bring a Bible in and for one juror to selectively read from the Bible in support of his position in a criminal case. Violent? The standard instruction, which is given, I believe, in most cases, and in that sense it would be – it would be juror misconduct. The critical question – Who are the people that can recite the Bible text verse by verse? There's nothing wrong with that, Your Honor, nothing whatsoever. Why do you go so many – look, my Bible is Zygmunt Freud, and I read Freud last night, and Freud says that somebody that's like this guy will never get better. This is a sociopath, this is a guy with no conscience, people with no conscience, think only of themselves, have no empathy for other people, and if we ever let him out, if he should ever get out, he will rape and kill again, and the only way to make sure he doesn't do that is to execute him. There's nothing wrong with that, Your Honor. In fact, that's jury deliberation. That's what we ask them to do. Well, what about addiction then? What if one of the jurors said, you know, I'm simply opposed to the death penalty, I don't think that it should ever be imposed, and here are five reasons why not, and I vote – I suggest that all of – despite what the – you were told by the judge about what we're supposed to be doing, you should simply take the law into your own hands and vote against this because the death penalty is a bad thing. Under the Federal rule, that act would be unreviewable, but I believe that that would – in fact, you make it – Yes, but it would be jury misconduct. I mean, that's – that's really – there's really a balance here between what we're going to find out about and what, if we find out about it, we would condemn. Yes. Right? I believe the cases that involve – that involve these cases, that involve these instances, always reflect that tension. And the two cases – Okay. So in some ways, the difference between what's in writing and what isn't is the extrinsicness allows us to find out about it. I think that's – I think that might, in fact, be so. So he came into the room with a written-down piece of paper saying this is what I'm – here are 17 arguments about why the death penalty is a bad thing. Yes. And I've – and with quotations from various sources. Then what? Then what? Then what? Is that then juror misconduct that we can act upon because we have objective evidence that she was using extrinsic sources to make her argument? No. And that it was in writing so we can prove it up without having to get into the deliberations? No. My argument has not been, Your Honor, that what White did violated the Federal Constitution at all. It's been the – it's quite the opposite. But you just told me that she – that she would have been improper, but we couldn't have gotten at it because we can't – because of the evidentiary rules. Is that what you said about this other hypothetical? I'm saying that it's an anomaly in this area of the law that because of Rule 606b, we cannot find out about the quotations from Contrary to the Bible. Would you say, please? Yes. About the juror vote, we have cases that say that one of the things that you can't inquire into is the point in the proceeding or the time in the proceeding at which the extraneous evidence is discussed or introduced. Do you know of any case that says either way that the question – when you talk about the time or point in the proceeding, that it's improper to inquire into what the juror vote was at that point? I don't know a case, but I do know a rule, Your Honor. And Rule 606b applies to – No, I know what Rule 606b says. Has there been any interpretation when they say the point in the proceeding, whether that means only the hour or whether it means where the jurors were in the proceeding? I can't give you a case, but I can say that it's objectively verifiable what time of the jury proceedings. That's not something that comes from the juror. Well, so is the vote, because the foreman had notes about what the vote was. But, sir, you don't know of any authority either way on that point. I do not. Your time has expired, Your Honor. Thank you. Your Honor, I just want to read a couple of questions from the Hiller deposition that I took in 2002. Do you recall during the trial your wife asking you if she could go with you to court to see if Stevie Fields was the guy who attacked her? Yes. And do you recall telling her that, no, she could not? Yes. Why did you tell her no? Because I didn't want to compromise me as a juror. And plus the fact I didn't want any of this psychological trauma to affect our home life. Why were you afraid that if she came and saw him, it would compromise the jury? Because of whatever she might suspect. And suppose, indeed, in fact, she did ID him as the perpetrator. Right. That's what I mean. Suppose she did. Right. Did you feel like that would then compromise the trial that was going on at the time? Of course. Why is that? Because if she ID'd him, then that would invalidate me as an objective juror, wouldn't it? So these conversations did occur. And Jury Hiller chose to defend zealously his position on this jury, did not disclose these conversations to the trial judge. And we didn't learn about this until the federal habeas corpus proceedings. May I ask one question here? If we were to decide that the situation was the situation of implied bias, then we need not reach the bringing the biblical verses into the jury deliberations issue? Yes, Your Honor, because it would be a structural error if Jury Hiller is a biased juror. So you wouldn't have to get to the penalty phase issues. Finally, I'd like to follow up on a couple of comments that Mr. Jurstad made. And he said that these biblical passages favored death in an abstract way. And that is precisely the problem here. Judge Schroeder, in the Sandoval decision, talked about this. This is a death penalty case. This is not supposed to be an exercise in abstract thinking. And the prejudice from that is especially compelling here. Because we do know that seven jurors on the morning of the second day, with not a shred of mitigating evidence, in this case, a new Stevie Fields was 23 years old. They were still going to vote for life, without anything to humanize him, without any mitigating evidence. Then, when these abstract biblical commandments came in, there was nothing that those pro-Elwok jurors could argue at that point. So one of the big problems here, and this is discussed in Sandoval, the Constitution requires individualized sentencing, sophisticated schemes that winnow out who's going to get the death penalty. Stevie Fields did not get that in this case for two reasons. His lawyer didn't do a thing to humanize him. And there is a compelling case in mitigation in this case, which I don't have time to get into, but which is in the briefs, a very compelling case. He didn't present any of that. He did not present any case to humanize Mr. Fields. That, coupled with what Mr. White did, which is to bring in these abstract dictates and mandates of death, singularly and certainly collectively prejudiced Mr. Fields. Counsel, your time has expired. Okay. Thank you, Your Honor. Thank you. The case is closed. We have committed the decision. That concludes the Court's counsel discussion. The Court stands adjourned.
judges: Schroeder, Reinhardt, Kozinski, O'scannlain, Rymer, Thomas, Silverman, McKeown, Wardlaw, Gould, Berzon, Tallman, Clifton, Callahan, Bea